DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Defendant-Appellant Michael Clay appeals from his conviction and sentence in the Summit County Court of Common Pleas. This Court affirms.
 I {¶ 2} On August 28, 2006, Clay and Cynthia Jones's eight month old daughter, M.C., died after paramedics were unable to resuscitate her. Doctors found multiple bruises and contusions on M.C.'s face as well as blood in her nose and a cut to her lip. The medical examiner autopsied M.C. and determined that her death was a homicide caused by blunt force impacts to the head. Subsequently, police officers arrested Clay in connection with M.C.'s death. *Page 2 
 {¶ 3} Cynthia Jones met Clay while the two worked at Taco Bell and became pregnant after they began dating. Jones testified that Clay never wanted her to have the baby and asked her to get an abortion so as not to "ruin his life." Once M.C. was born, Clay was forced to spend a great deal of time caring for M.C. He lost his job at Taco Bell, so he stayed at home to watch M.C. while Jones continued to work. Eventually, the couple moved into Clay's mother's home.
 {¶ 4} Jones testified that M.C. frequently had bruises on her head and body, but that Clay would always claim that the bruises were self inflicted or a result of his playing too roughly with her. For instance, at two months of age M.C. sustained a bruise to her forehead, and Clay claimed that she incurred the bruise rolling over in her bassinet and hitting her head on the bars. Even so, questions regarding M.C.'s frequent injuries never surfaced until the spring of 2006. In May of 2006, Jones returned home to find Clay holding M.C. in a blanket. Jones discovered that M.C. had burns on the lower half of her body, so she took M.C. to the hospital. After M.C. received treatment, police questioned Clay about her injuries. The investigating officer, Sergeant Gregory Johnson, became suspicious of Clay because Clay gave multiple versions of the same story. In each version, Clay indicated that M.C. received the burns from her bath water, but the details of how this occurred changed. In one version, Clay alleged that he placed M.C. into the tub, and she started to scream approximately forty-five *Page 3 
seconds after he did so. He claimed that he checked the water before he placed her into it, but that it burned her nonetheless. In another version, Clay alleged that he did not check the water and thought that it must be too cold when he placed M.C. in it and she started to cry. He claimed that he turned on the hot water at that point and the hot water led to M.C.'s burns. In a third version, Clay alleged that he placed M.C. into the tub without any water at all and she was burned when he turned on the hot water to fill the tub. Sergeant Johnson included this information in his report, but M.C.'s case was assigned to another officer. Ultimately, the doctors and the police concluded that M.C.'s burns were accidental, so no charges were filed.
 {¶ 5} On the night of August 27, 2006, Jones bathed M.C, dressed her in a yellow "onesie" with flowers on it, and put her to bed. Jones testified that M.C. only had two faded bruises on her head at this point in time, which Clay claimed had come from her "playing with her toys." The next morning, Jones could not get M.C. to take her bottle, so she told Clay to feed M.C. and left for work shortly before 8:00 a.m. At approximately 9:36 a.m., she received a phone call from Clay's mother, who indicated that M.C. was not breathing and the ambulance was on its way.
 {¶ 6} Pamela Cunningham, Clay's mother, testified that she was sleeping on the downstairs' couch on the morning of August 28th, when she heard Clay yelling for her help. She further testified that Clay came running downstairs with *Page 4 
M.C. in his arms. M.C. had no pulse and was not breathing, so Cunningham told Clay to call 911 while she attempted CPR on M.C. Paramedics arrived soon after and transported M.C. to the hospital where she was pronounced dead.
 {¶ 7} On August 13, 2007, Clay's jury trial commenced based on the following charges: (1) aggravated murder pursuant to R.C. 2903.01(C); (2) murder, a special felony pursuant to R.C. 2903.02(B); (3) felonious assault pursuant to R.C. 2903.11(A)(1); (4) child endangering pursuant to R.C. 2919.22(A), a misdemeanor of the first degree based on conduct occurring prior to August 2006; (5) child endangering pursuant to R.C.2919.22(B)(1), a felony of the second degree based on conduct occurring on August 20, 2006; (6) obstructing official business pursuant to R.C.2921.31(A); and (7) tampering with the evidence pursuant to R.C.2921.12(A)(1). The State dismissed the obstruction charge prior to deliberation, but the trial court denied Clay's Crim.R. 29 motion to dismiss the other charges. The jury convicted Clay of murder, felonious assault, and child endangering pursuant to R.C. 2919.22(B)(1). The jury found Clay not guilty of aggravated murder, tampering with the evidence, and child endangering pursuant to R.C. 2919.22(A). The trial court sentenced Clay to a total of fifteen years to life in prison.
 {¶ 8} Clay has timely appealed to this Court, raising three assignments of error for our review.
 II *Page 5 Assignment of Error Number One "THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S ORAL MOTION FOR DIRECTED VERDICT PURSUANT TO CRIMINAL RULE 29 BECAUSE THE APPELLEE PRESENTED INSUFFICIENT EVIDENCE IN ORDER TO MEET EACH AND EVERY ELEMENT OF THE OFFENSES OF MURDER — A SPECIAL FELONY, CHILD ENDANGERING, AND FELONIOUS ASSAULT. IN ADDITION, THE APPELLANT'S CONVICTION WAS AGAINST THE WEIGHT OF THE EVIDENCE."
 {¶ 9} In his first assignment of error, Clay argues that his convictions for murder, child endangering, and felonious assault were based on insufficient evidence and that they were against the manifest weight of the evidence. We disagree.
 {¶ 10} Initially, we note that Clay has failed to set forth his sufficiency and manifest weight arguments in separate assignments of error. See App.R. 16(A)(7); Loc.R. 7(B)(7). More importantly, however, is that Clay's substantive argument fails to address all of the convictions that his assignment of error encompasses. This Court looks to an appellant's assignment of error as a roadmap, which directs our analysis of the trial court's judgment. Bennett v. Sunnywood Land Dev.,Inc., 9th Dist. No. 06CA0089-M, 2007-Ohio-2154, at ¶ 46. But if an appellant's substantive argument fails to address one or more of the issues set forth in an assignment of error, we will not address that particular issue. Id. See, also, App.R. 16(A)(7) (requiring that each assignment of error be supported by an argument containing the rationale for that argument and citations to relevant *Page 6 
authority, statutes, and parts of the record). Consequently, we confine our analysis to the issues that Clay has actually argued in the body of his brief.
 {¶ 11} Clay's substantive argument takes issue with his convictions for murder pursuant to R.C. 2903.02(B) and felonious assault pursuant to R.C. 2903.11(A)(1). Clay argues that there is no evidence that he knowingly attempted or actually inflicted harm upon the victim, a necessary element of felonious assault. He further argues that his murder conviction depended upon the jury finding that he knowingly committed felonious assault. See R.C. 2903.02(B) (listing as a necessary element that the offender caused another's death by engaging in a first or second degree felony offense of violence). Accordingly, he claims that the jury erred in convicting him of felonious assault and of murder, both of which depended upon his knowingly harming the victim.
 {¶ 12} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review *Page 7 
the evidence in a light most favorable to the prosecution. State v.Jenks (1991), 61 Ohio St.3d 259, 279. Furthermore:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus; see, also, Thompkins, 78 Ohio St.3d at 386.
In State v. Roberts, this Court explained:
 "[Sufficiency is required to take a case to the jury[.] * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2.
Accordingly, we address Clay's challenge to the weight of the evidence first, as it is dispositive of his claim of sufficiency.
 {¶ 13} In determining whether a conviction is against the manifest weight of the evidence an appellate court:
 "[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the *Page 8 
conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten, 33 Ohio App.3d at 340.
 {¶ 14} R.C. 2903.02(B) provides as follows:
 "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]"
A violation of R.C. 2903.11 constitutes an "offense of violence." R.C.2901.01(A)(9)(a). R.C. 2903.11, the felonious assault statute, provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another[.]" R.C. 2903.11(A)(1). In defining the term "knowingly," the Revised Code provides that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Whoever commits a violation of R.C.2903.11(A)(1) is guilty of a felony of the second degree. R.C.2903.11(D)(1). Consequently, the State may rely upon a violation of R.C.2903.11(A)(1) to satisfy the actus reus element of R.C. 2903.02(B). See R.C. *Page 9 2903.02(B) (applying when another's death is caused by an offender's engaging in a second degree felony offense of violence).
 {¶ 15} The record reflects that numerous witnesses testified about the injuries that M.C. sustained prior to her death. Jones testified that M.C. frequently had bruises on her face and head. She testified that she initially believed that these bruises were caused by Clay playing "too roughly" with M.C. and that she told Clay that he should not play so roughly with M.C. at such a young age. Melissa Williams, M.C.'s occasional babysitter, testified that she had seen M.C. with bruising down both the left and right sides of her face at her jaw line when M.C. was approximately two to three months old. Kelly Jansen, a coworker of Cynthia's and Clay's, testified that M.C. also had bruising on her face when Jones brought her to the restaurant at four to five months of age. Moreover, Marsha Singleton, Cynthia's sister and M.C.'s occasional babysitter, testified that M.C. "always" had bruises when she babysat for her.
 {¶ 16} Several officials who responded to Clay's 911 call testified at his trial and explained what they observed when they arrived at Clay's residence on the morning of M.C.'s death. Officer Thomas Mason, Firefighter Stephen Bosso, and Firefighter Brian Cyphert all testified that M.C. had bruising on the left side of her face when they came to attend to her. Firefighter Cyphert also testified that M.C.'s pupils were dilated when he examined her, indicating that she had suffered a head injury. Firefighter Cyphert acknowledged that he and the other paramedics *Page 10 
created an airway for M.C. and placed a mask over her nose and mouth to bag her, but he stated that those actions could not have been the cause of M.C.'s facial injuries. Moreover, Doctor Robert Wilder, who cared for M.C. in the emergency room, testified that he had never seen resuscitative efforts cause the type of facial injuries that M.C. had.
 {¶ 17} Doctor Daniel Galita performed M.C.'s autopsy. Dr. Galita testified that M.C. died as a result of blunt force impacts to her head, which caused subgaleal contusions.[1] He further testified that he found seventeen contusions on M.C.'s head and mild swelling in her brain as a result of the head trauma. Dr. Galita also discovered large amounts of iron-laden macrophages in M.C.'s lungs. He explained that iron-laden macrophages develop in a person's lungs when they are forcibly deprived of oxygen for too long and that a large amount of macrophages is indicative of smothering or strangling. While a person who is strangled generally develops other signs of the strangling as well, such as petechial hemorrhaging in the eyes, a person who is smothered might not display any other symptoms. Based on M.C.'s injuries and the large amount of macrophages in her lungs, Dr. Galita concluded that M.C. had been repeatedly smothered over a period of time. He indicated that macrophages do not appear immediately after asphyxiation and that M.C.'s macrophages would have taken approximately a *Page 11 
week to develop. Dr. Galita concluded that M.C. had been strangled repeatedly prior to the blunt force head trauma that ultimately claimed her life. He specified that a child of M.C.'s age could not inflict such injuries on herself.
 {¶ 18} Clay gave Jones, the police, and other witnesses multiple versions of the events leading up to M.C.'s death. Sergeant Feketik conducted the initial interview with Clay shortly after M.C.'s death. During that interview, Clay stated that he put M.C. in her playpen and went downstairs to get her a bottle and start a load of laundry. He stated that he went upstairs a few minutes later, found M.C. was not breathing, and rushed her downstairs to his mother and to call 911. Approximately forty-five minutes after Clay's initial interview with Sergeant Feketik, he gave the Sergeant a written statement. The written statement indicated that before Clay put M.C. in her playpen he gave her a remote control to play with and that she hit herself three times in the head and once in the mouth with it. Clay wrote that he wiped off M.C.'s mouth and placed her in her playpen where she leaned over and laid down. He further wrote that when he came back upstairs with her bottle he found her face down in the playpen. He claimed that he smacked M.C.'s face to try to revive her and then tried to perform CPR on her before bringing her down to his mother.
 {¶ 19} Jones testified that Clay initially told her the following story. Clay stated that he played with M.C. for a short time before putting her in her playpen. While they were playing, Clay claimed that he gave M.C. the remote control and *Page 12 
she hit herself in the head with it. He claimed that he took the remote away, but gave it back to her whereupon she hit herself again. After that, he put her in her playpen and went downstairs "for no longer than thirty seconds" after which he returned to find M.C. face down and unresponsive. After Jones actually saw M.C. at the hospital, however, she again questioned Clay about what happened because there were many marks and bruises on M.C.'s face that had not been there when Jones left in the morning. Clay responded that he did not know where the bruising came from and that the bruises had not been there when the paramedics arrived. On their drive home from the hospital, Clay added that M.C. had hit her lip with the remote in addition to hitting her head. Finally, once the police began to investigate M.C.'s death, Clay told Jones the remote had struck M.C. in the head after he had already placed her in her playpen. He claimed that the remote was on the dresser next to the playpen and it fell on M.C. when she reached for it.
 {¶ 20} Kelly Jansen, a coworker of Jones and Clay, testified that after M.C. died Clay told her the following story. Clay stated that he had put M.C. in her playpen, went downstairs for a few seconds to make her bottle, and found her face down in her crib when he returned. He also stated that he turned M.C. over, cleaned out her mouth, and then took her straight downstairs to his mother. Later, however, Clay added to the story, stating that he also handled a load of laundry when he went downstairs to make M.C.'s bottle. Finally, Clay gave Jansen a third *Page 13 
version of the story in which he claimed that he left M.C. on the bed before he went downstairs and returned to find her face down on the floor.
 {¶ 21} Police collected multiple samples and swabs from Clay's home after they began investigating M.C.'s murder. John Saraya, a special agent with the Ohio Bureau of Criminal Identification and Investigation ("BCI"), testified that M.C.'s playpen was located in the master bedroom of Clay's home directly next to the bed. M.C.'s diaper bag sat in the space between the bed and the playpen. Agent Saraya testified that BCI took samples from the bed mattress, carpet, diaper bag, playpen, door frame of the master bedroom, and from the remote control that Clay claimed M.C. hit herself with. Dale Laux, a BCI forensic scientist, testified that every single one of the samples tested presumptive for the presence of M.C.'s blood except for the remote control.
 {¶ 22} There were two items that BCI could not test during their investigation. First, BCI could not test the yellow "onesie" that M.C. had been wearing on the morning of her death. Paramedics testified that M.C. had been clad only in a diaper when they arrived in response to Clay's 911 call. Since Jones indicated that M.C. was wearing the onesie when she left for work in the morning, someone obviously removed M.C.'s onesie prior to the paramedics' arrival. However, neither Jones nor the police were ever able to find M.C.'s onesie. Second, BCI was not able to test Jones and Clay's bed sheets. Jones testified that they were on the bed when she left for work in the morning, but that they were *Page 14 
gone when she and Clay returned from the hospital. Clay told Jones that he had washed the sheets that morning. Yet, Jones testified that she found this to be unusual because she had washed the sheets quite recently.
 {¶ 23} Based on the evidence in the record before us, we cannot conclude that the jury lost its way in finding Clay guilty of felonious assault and of murder. Throughout her short lifetime, M.C. consistently showed signs of bruising. Her bruises would appear after spending time with Clay, who always attributed them to various, innocuous causes. After her death, the medical evidence showed that she was the victim of repeated smothering and ultimately died from blunt force trauma to her head that she could not have caused. Clay never gave a consistent explanation for how M.C. incurred these injuries. Rather, he changed his story many times and claimed that she died from self inflicted wounds.
 {¶ 24} Contrary to Clay's assertion, we find numerous pieces of evidence in the record to support the jury's finding that Clay knowingly inflicted harm upon M.C. See R.C. 2901.22(B) (defining the term "knowingly"). The fact that the majority of these pieces of evidence are circumstantial in nature is inapposite. "Circumstantial evidence and direct evidence inherently possess the same probative value." State v.Treesh (2001), 90 Ohio St.3d 460, 485, citing Jenks, 61 Ohio St.3d at paragraph one of the syllabus. The circumstantial evidence supports the conclusion that Clay consistently beat M.C. and that the beatings continued to escalate until M.C. finally died as a result. The jury did not lose its way in finding *Page 15 
that Clay knowingly caused serious physical harm to M.C. and that Clay's conduct resulted in her death. See R.C. 2903.11(A)(1) (defining second degree felonious assault as knowingly inflicting serious physical harm upon another); R.C. 2903.02(B) (defining murder as causing the death of another while committing a felony of the second degree).
 {¶ 25} Having disposed of Clay's challenge to the weight of the evidence, we similarly dispose of his sufficiency challenge. SeeRoberts, supra, at *2. Clay's first assignment of error is overruled.
 Assignment of Error Number Two "THE TRIAL COURT ERRED IN FAILING TO GRANT THE APPELLANT'S MOTION FOR RELIEF FROM PREJUDICIAL JOINDER BECAUSE TRYING THE APPELLANT FOR ALLEGED CRIMES OF WHICH HE HAD PREVIOUSLY BEEN CLEARED FROM WITHIN ANOTHER COUNTY GREATLY PREJUDICED HIS DEFENSE AND VIOLATED HIS RIGHT TO A CONSTITUTIONALLY FAIR TRIAL."
 {¶ 26} In his second assignment of error, Clay argues that the trial court erred in denying his motion for relief from prejudicial joinder. On January 23, 2007, Clay filed a motion for relief from joinder in the trial court, seeking to sever count six in the indictment.[2] Count six charged Clay with child endangerment in *Page 16 
violation of R.C. 2919.22(A) based on his continuing course of conduct from December 2005 to August 28, 2006. Essentially, the count revolved around the burns that M.C. received in May of 2006 when Clay attempted to bath her. Clay argues that Summit County did not have jurisdiction over that conduct because it actually occurred in Portage County, prior to the parties moving to Summit County. He further claims that the introduction of that evidence prejudiced his entire trial because M.C.'s burn injuries stemmed from an isolated, accidental incident rather than a continuous course of conduct.
 {¶ 27} Pursuant to Crim.R. 14, "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses * * * the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires." The Ohio Supreme Court has held that:
 "A defendant claiming error * * * under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." State v. Torres (1981), 66 Ohio St.2d 340, syllabus.
An abuse of discretion is more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion *Page 17 
standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621.
 {¶ 28} After a defendant informs the trial court of his basis for arguing that joinder would be prejudicial, the prosecutor can rebut the allegations of prejudice in one of two ways. Under the first method, the prosecutor may argue that the evidence the defendant seeks to admit would have been admissible regardless of joinder as "other acts" evidence. State v. Lott (1990), 51 Ohio St.3d 160, 163, citingBradley v. U.S. (CA D.C. 1969), 433 F.2d 1113, 1118-19; Evid.R. 404(B). "Under the second method, the `joinder' test, the state is not required to meet the stricter `other acts' admissibility test, but is merely required to show that evidence of each crime joined at trial is simple and direct." Lott, 51 Ohio St.3d at 163, citing State v. Roberts (1980),62 Ohio St.2d 170, 175; Torres, 66 Ohio St.2d at 344. "Thus, when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as `other acts' under Evid.R. 404(B)." Lott, 51 Ohio St.3d at 163-64.
 {¶ 29} While the State generally cannot introduce other acts evidence to prove that a defendant possessed a certain character trait and acted in conformity therewith, Evid.R. 404(B) permits the State to introduce evidence of other crimes, wrongs, or acts in certain instances. Such evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). In *Page 18 
arguing that M.C.'s May 2006 injuries were unrelated to her August 2006 injuries, Clay focuses on the method of injury and the fact that the May 2006 injuries were found to be accidental. We address these arguments separately.
 {¶ 30} First, Clay argues that M.C.'s injuries were not similar enough to permit their introduction at trial because burning, smothering, and blunt force trauma injuries bear no relation to one another. However, the pattern of M.C.'s injuries made them relevant and admissible as other acts evidence, not the method by which they were inflicted. Multiple witnesses at trial testified that M.C. displayed signs of abuse her entire life, mostly in the form of bruising. These injuries, including the burn injuries, always occurred after M.C. had spent time alone with Clay. Although M.C.'s injuries were not of the exact same nature, we cannot say that they do not amount to a pattern of abuse. All of M.C.'s injuries tend to show that Clay intended to inflict serious physical harm upon M.C. See Evid.R. 404(B). Furthermore, all of the injuries evince that M.C.'s fatal injuries were not the result of a mistake or accident. See id. The evidence of M.C.'s burn injuries was admissible under Evid.R. 404(B).
 {¶ 31} Second, Clay argues M.C.'s May 2006 injuries were found to be accidental, not intentional, and so their introduction confused the jury and prejudiced his trial. See Evid.R. 403 (noting that relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice). "The admission or exclusion of relevant evidence rests within the *Page 19 
sound discretion of the trial court." State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. An appellate court will not disturb an evidentiary ruling absent an abuse of discretion that produced a material prejudice to the aggrieved party. State v.Roberts, 156 Ohio App.3d 352, 2004-Ohio-962, at ¶ 14. Based on our review of the record, we find no prejudicial error in the court's admission of this evidence.
 {¶ 32} Although the jury ultimately acquitted Clay of the charge related to M.C.'s May 2006 burn injuries, the record supports the trial court's decision to admit the evidence related to the charge. The record reflects that Clay's explanation as to how M.C. received her burns changed on multiple occasions. Much like the later stories involving the remote control, Clay gave Jones and Sergeant Johnson several different versions of how the hot water in the tub burned M.C. However, the doctor who opined that M.C.'s death was accidental only received one version of the events. Doctor Richard Steiner examined M.C. after the burning incident and directly questioned Clay about the incident. Dr. Steiner concluded that M.C.'s burns were accidental based on his examination of M.C. and Clay's explanation. At trial, Dr. Steiner testified that he was unaware that Clay had given multiple, different explanations about how M.C.'s burns occurred and that had he known that information he might have concluded M.C.'s burns were not accidental. Given the extensive probative value of this evidence, we cannot conclude that the trial court abused its discretion in admitting it. See *Page 20 
Evid.R. 403 (indicating that prejudicial evidence should be omitted only when its prejudicial effect outweighs its probative value). The record supports the trial court's ruling that the evidence of M.C.'s burn injuries was admissible under both Evid.R. 404(B) and 403.
 {¶ 33} Because we conclude that the State negated any prejudice to Clay by meeting the more stringent "other acts" method discussed inLott, we need not analyze whether the State also met the less stringent "joinder test." See Lott, 51 Ohio St.3d at 163-64. Clay cannot show prejudice as a result of the trial court's failure to grant his Crim.R. 14 motion. See Lott, 51 Ohio St.3d at 163. Clay's second assignment of error lacks merit.
 Assignment of Error Number Three "THE TRIAL COURT ERRED IN NOT GRANTING THE APPELLANT'S REQUEST FOR A MISTRIAL DUE TO THE APPELLEE'S WITNESS HIGHLY PREJUDICIAL REFERENCE TO MONEY BEING RAISED FOR THE APPELLANT'S LAWYER LONG BEFORE THE APPELLANT WAS CHARGED WITH ANY CRIME." (Sic.)
 {¶ 34} In his third assignment of error, Clay argues that the trial court erred in not ordering a mistrial. Clay claims that the following colloquy entitled him to a new trial:
 "PROSECUTOR: You mentioned regarding the donation of [M.C.'s funeral] money, do you know what happened to that money?
 "DEFENSE: Objection.
 "COURT: You can answer. *Page 21 
 "JONES: It went toward his lawyer."
Specifically, he argues that this testimony suggests that Clay hired a lawyer prior to being charged with M.C.'s death because he knew he would be a suspect.
 {¶ 35} The decision whether to grant or deny a motion for mistrial "lies within the sound discretion of the trial court" and will not be reversed absent a showing of abuse of discretion. State v. Garner
(1995), 74 Ohio St.3d 49, 59, citing State v. Glover (1988),35 Ohio St.3d 18, 19; State v. Widner (1981), 68 Ohio St.2d 188, 190. "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected; this determination is made at the discretion of the trial court." State v.Reynolds (1988), 49 Ohio App.3d 27, 33. An abuse of discretion is more than an error of law or judgment, but rather, it is a finding that the court's attitude is unreasonable, arbitrary or unconscionable.Blakemore, 5 Ohio St.3d at 219. Under this standard of review, an appellate court may not merely substitute its judgment for that of the trial court. Pons, 66 Ohio St.3d at 621. The granting of a mistrial is necessary only when a fair trial is no longer possible. State v.Franklin (1991), 62 Ohio St.3d 118, 127, citing Illinois v.Somerville (1973), 410 U.S. 458, 462-63.
 {¶ 36} Clay's counsel objected to Jones's statement immediately after she made it, and the trial court held a side bar. At side bar, Clay's counsel argued that the remark was prejudicial because he was actually a court appointed attorney, and *Page 22 
there was no indication that Clay actually used the money from M.C.'s funeral to pay for an attorney. The trial court rejected Clay's motion for a mistrial, but issued a curative instruction to the jury. The judge instructed the jury as follows:
 "[T]here is absolutely no evidence that the money that was collected was used for an attorney. You are to disregard totally the statement that you just heard. Also the attorneys that are here today are court appointed attorneys. So, all of the information that you just heard on the last statement you are to totally disregard."
Clay argues that the trial court's curative instruction was insufficient, but he fails to cite any law in support of this proposition or to explain why the court's instruction did not sufficiently cure the alleged defect in the trial. See State v.Taylor (Feb. 9, 1999), 9th Dist. No. 2783-M, at *3 (noting that an appellant has the burden of demonstrating error on appeal by citing to legal authority in support of his proposition). See, also, App.R. 16(A)(7); Loc.R. 7(B)(7). The court clearly told the jury to disregard Jones's remark and framed its instruction around Clay's specific objection. Given the court's remedial actions, we cannot conclude that the court abused its discretion in denying Clay's motion for a mistrial. Clay's third assignment of error is overruled.
 III {¶ 37} Clay's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed. *Page 23 
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
SLABY, P. J., DICKINSON, J., CONCUR
[1] Dr. Galita further explained that the term "subgaleal contusion" refers to bruising under the scalp in the area between the scalp and the skull.
[2] Clay's motion for relief from prejudicial joinder asks the court to sever both counts six and seven of the indictment based on the fact that they took place outside of Summit County. However, count seven of the indictment charged Clay with obstructing official business on or about August 28, 2006. The charge clearly relates to activity that took place inside of Summit County. We can only conclude that Clay accidentally included this count in his motion below. Since neither Clay's motion nor his brief specify what evidence, if any, relating to count seven prejudiced his trial, we decline to address count seven. See App.R. 16(A)(7). *Page 1