[Cite as *State v. Hoffman*, 2013-Ohio-1021.]

STATE OF OHIO            )            IN THE COURT OF APPEALS
                         )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT         )

STATE OF OHIO

      Appellee

      v.

CHRISTOPHER L. HOFFMAN

      Appellant

C.A. No.     26084

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 08 12 4060 (A)

DECISION AND JOURNAL ENTRY

Dated: March 20, 2013

WHITMORE, Judge.

**{¶1}** Defendant-Appellant, Christopher Hoffman, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I

**{¶2}** At around 3:00 a.m. on December 10, 2007, EMS responders and several members of the Cuyahoga Falls Police Department were dispatched to an apartment shared by Hoffman, his wife, and their infant son. Hoffman and his wife sought help for their son, N.H., born October 2, 2007, because he had an obstructed airway. By the time the EMS responders arrived, N.H. had no heartbeat and was not breathing. Although both the EMS responders and the hospital staff at Akron Children's Hospital attempted to revive N.H., they were unsuccessful. N.H. was pronounced dead shortly after he arrived at the hospital.

**{¶3}** Subsequently, an autopsy was performed and a balled-up piece of tissue paper was removed from the back of N.H.'s throat. N.H. also had several facial injuries and injuries to

his mouth. Moreover, when the medical examiner x-rayed N.H., she discovered that he had a broken collar bone and multiple rib fractures. Although some of the rib fractures were new, many of the rib fractures displayed signs of healing, meaning that N.H. had sustained them at some point before his death.

{¶4} A grand jury indicted Hoffman on twelve counts, seven of which the State dismissed prior to trial. The following five counts remained for trial: (1) aggravated murder, in violation of R.C. 2903.01(C); (2) felony murder, in violation of R.C. 2903.02(B); (3) involuntary manslaughter, in violation of R.C. 2903.04(A); (4) child endangering, in violation of R.C. 2919.22(B)(1); and (5) child endangering, in violation of R.C. 2919.22(A). The two child endangering charges related to different incidents. Specifically, one charge (R.C. 2919.22(B)(1)) pertained to the harm N.H. suffered near the time of his death, wherein the State alleged that Hoffman caused N.H.'s airway to be blocked, and the other charge (R.C. 2919.22(A)) pertained to rib fractures that N.H. suffered before his death, wherein the State alleged that Hoffman previously had abused N.H.

{¶5} Hoffman filed a motion to sever the child endangering count related to N.H.'s rib fractures from his remaining counts for trial purposes, but the trial court denied his motion. Subsequently, the matter proceeded to a jury trial. The jury found Hoffman not guilty of aggravated murder, but guilty of the remaining counts. The court then sentenced Hoffman to fifteen years to life in prison.

{¶6} Hoffman now appeals from his convictions and raises three assignments of error for our review.

II

Assignment of Error Number One

THE TRIAL COURT ERRED WHEN IT DENIED MR. HOFFMAN'S MOTION FOR RELIEF FROM PREJUDICIAL JOINDER OF OFFENSES, GREATLY PREJUDICING HIS DEFENSE AND VIOLATING HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW.

{¶7}    In his first assignment of error, Hoffman argues that the trial court erred by refusing to sever the child endangering count pertaining to N.H.'s old rib fractures from his remaining counts for purposes of trial.  We disagree.

{¶8}    "It is well-settled that the law favors joinder." *State v. Merriweather*, 9th Dist. No. 97CA006693, 1998 WL 239773, *3 (May 6, 1998).  Crim.R. 8 governs the joinder of multiple offenses in a single indictment while Crim.R. 14 governs the joinder of offenses, whether in a single or separate indictment(s), for trial.  *State v. Hatfield*, 9th Dist. No. 23716, 2008-Ohio-2431, ¶ 14.  "To preserve a claimed error under Crim.R. 14, * * * a defendant must renew his * * * motion to sever either at the close of the State's case or at the conclusion of all of the evidence." *State v. Miller*, 9th Dist. Nos. 10CA009922 & 10CA009915, 2012-Ohio-1263, ¶ 17.  A renewal of the motion is necessary because a Crim.R. 14 analysis examines any prejudice resulting from the joinder in light of the evidence introduced at trial.  *See Hatfield* at ¶ 14-15, citing *United States v. Terry*, 911 F.2d 272, 277-278 (9th Cir.1990).  A defendant's failure to renew his Crim.R. 14 motion "results in a forfeiture of the issue on appeal." *State v. Vu*, 9th Dist. No. 11CA0042-M, 2012-Ohio-746, ¶ 37.

{¶9}    Hoffman concedes that he sought to sever his charges pursuant to Crim.R. 14 and that he failed to properly renew his motion to sever.  He argues in his reply brief that the trial court's failure to sever his charges amounts to plain error.  Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the

attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. "A defendant claiming error * * * under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced * * *." *State v. Patel*, 9th Dist. No. 24024, 2008-Ohio-4692, ¶ 52, quoting *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus. "Only an actual injustice, and not merely a risk of injustice, is sufficient." *State v. Groce Hopson*, 9th Dist. No. 03CA008377, 2004-Ohio-2949, ¶ 13.

{¶10} "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992). Thus,

> [a] prosecutor can use two methods to negate such claims of prejudice. Under the first method, the "other acts" test, the [S]tate argues that it could have introduced evidence of the [] crimes under the "other acts" portion of Evid.R. 404(B), [even] if the * * * offenses had been severed for trial. Under the second method, the "joinder" test, the [S]tate is not required to meet the stricter "other acts" admissibility test, but is merely required to show that evidence of each crime joined at trial is simple and direct. Thus, when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as "other acts" under Evid.R. 404(B).

(Citations omitted.) *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). *Accord State v. Shipley*, 9th Dist. No. 03CA008275, 2004-Ohio-434, ¶ 75. "[T]he jury is capable of segregating the proof of multiple charges when * * * the evidence of each crime is uncomplicated." *State v. Hamblin*, 37 Ohio St.3d 153, 159 (1988).

{¶11} "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination

to commit crime or that he acted in conformity with bad character." *State v. Williams*, Slip Opinion No. 2012-Ohio-5695, ¶ 15. Yet, "Evid.R. 404(B) contains a non-exhaustive list of exceptions under which other acts evidence may be admitted for a purpose other than to show propensity." *State v. Calise*, 9th Dist. No. 26027, 2012-Ohio-4797, ¶ 41. The rule provides that "[e]vidence may be admissible to show 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *In re J.C.*, 9th Dist. Nos. 26229 & 26233, 2012-Ohio-3144, ¶ 13, quoting Evid.R. 404(B).

{¶12} The Ohio Supreme Court recently held that:

in considering other acts evidence, trial courts should conduct a three-step analysis.

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

(Internal citations omitted.) *Williams* at ¶ 19-20. "[D]ecisions regarding the admissibility of other-acts evidence under Evid.R. 404(B) are evidentiary determinations that rest within the sound discretion of the trial court." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, syllabus.

{¶13} The evidence that Hoffman sought to exclude here was that N.H. had suffered rib fractures at some point prior to his death. X-rays taken at the time of N.H.'s autopsy revealed both old and new rib fractures. The old rib fractures led to a separate charge of child endangering because N.H. could not have sustained them at the same time that he sustained the new rib fractures. In its pre-trial ruling, the trial court held that the evidence of the old fractures

was admissible under Evid.R. 404(B) because it showed an absence of mistake or accident with regard to N.H.'s death.

{¶14} The first part of the *Williams* test for the admission of other acts evidence asks whether the evidence was relevant to a fact of consequence. *Williams* at ¶ 20. The defense's entire theory in this case was that N.H.'s death was a horrific accident caused by him sucking in or swallowing a piece of foreign material that Hoffman could not retrieve. The State, on the other hand, theorized that N.H. was the victim of abuse and that Hoffman had caused his untimely death by pushing foreign material into his mouth. The evidence was such that N.H. only had two primary caregivers: Hoffman and his wife. Hoffman's wife testified and denied ever having harmed N.H. in any manner. Therefore, evidence that N.H.'s ribs had been fractured on at least one previous occasion was relevant to determining whether he was a victim of abuse at Hoffman's hands.

{¶15} The second part of the *Williams* test questions the State's purpose in introducing the other acts evidence, i.e., whether it was to show propensity. *Id.* The State offered the evidence of N.H.'s old fractures to show, not that Hoffman had a propensity towards violence or abuse, but that N.H.'s death was not the result of an accident. Evidence may be admissible under Evid.R. 404(B) to show "absence of mistake or accident." This Court has upheld the admission of evidence that a primary caregiver may have abused a child who later suffered a fatal injury while with the same caregiver. *State v. Clay*, 9th Dist. No. 23889, 2008-Ohio-2158, ¶ 30. Specifically, we held that the evidence was admissible because the child's former injuries tended to show that the child's fatal injury was "not the result of a mistake or accident." *Id.* Hoffman claimed from the moment of N.H.'s death that the death was an accident. Thus, the evidence of N.H.'s old rib fractures was properly offered by the State to prove the absence of accident. *See*

*id.* *See also State v. Jones*, Slip Opinion No. 2012-Ohio-5677, ¶ 184-186 (evidence that defendant had perpetrated a different attack and rape admissible when defendant told police after his arrest, "[A]ll I'm going to say about this is that it was an accident").

**{¶16}** The third part of the *Williams* test asks whether the probative value of the other acts evidence at issue is outweighed by its prejudicial effect. *Williams* at ¶ 20. Although the evidence that N.H. had suffered old rib fractures was undoubtedly prejudicial to Hoffman, we cannot say that the prejudicial effect of that evidence outweighed its probative value. The evidence greatly detracted from the defense's theory that N.H. was well-cared for and simply died as the result of a horrific accident. Moreover, the trial court specifically instructed the jury that "[t]he evidence in each count must be considered separately, uninfluenced by your verdict in any other count." Although Hoffman's counts were joined for trial, the trial court told the jury to consider the counts separately in reaching it ultimate decision. This Court presumes that the jury followed the trial court's instruction. *See State v. Samuels*, 9th Dist. Nos. 25982, 25983 & 25984, 2012-Ohio-5401, ¶ 13, quoting *State v. Witcher*, 9th Dist. No. 26111, 2012-Ohio-4141, ¶ 33.

**{¶17}** Hoffman argues that the evidence of N.H.'s old rib fractures was not admissible because the State failed to present sufficient evidence that he caused the old fractures. According to Hoffman, the old fracture evidence was not admissible to prove absence of mistake or accident because "[he] had no prior knowledge of the rib injuries."

**{¶18}** Because Hoffman's charges were joined for trial, the State was trying the charge pertaining to N.H.'s old rib fractures at the same time it was trying Hoffman's other charges. It, therefore, had to prove that Hoffman caused N.H.'s old rib fractures during the course of the trial for Hoffman's other charges. Hoffman has not set forth any law to suggest that the State was

required to prove beyond a reasonable doubt that he caused N.H.'s old fractures before that evidence would be admissible in a trial on his other charges. *See* App.R. 16(A)(7). Further, this Court has upheld the admission of other acts evidence even where the jury later acquitted the defendant of the charge pertaining to the other acts at trial. *See Clay*, 2008-Ohio-2158, ¶ 32 ("Although the jury ultimately acquitted Clay of the charge related to [his daughter's] May 2006 burn injuries, the record supports the trial court's decision to admit the evidence related to the charge."). The jury here did in fact find that Hoffman caused N.H.'s old rib fractures. Nevertheless, the question of whether the State produced sufficient evidence that a defendant committed certain other acts is not one that a court considers in an Evid.R. 404(B) admissibility analysis. *See Williams*, 2012-Ohio-5695, at ¶ 20. Under the three-part test set forth in *Williams*, the trial court did not commit plain error by admitting the other acts evidence here.

{¶19} Because the evidence of N.H.'s old rib fractures was admissible other acts evidence, Hoffman cannot show prejudice as a result of the joinder of his multiple offenses. *See Schaim*, 65 Ohio St.3d at 59; *Lott*, 51 Ohio St.3d at 163. Moreover, due to that conclusion, this Court need not analyze whether the old rib fracture evidence was simple and distinct. *See Clay* at ¶ 33 (appellate court need not perform less stringent joinder test when "more stringent" other acts test met). The trial court did not commit plain error by denying Hoffman's motion to sever his charges for purposes of trial. Hoffman's first assignment of error is overruled.

Assignment of Error Number Two

> THE TRIAL COURT VIOLATED MR. HOFFMAN'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN, IN THE ABSENCE OF SUFFICIENT EVIDENCE, THE TRIAL COURT CONVICTED HIM OF MURDER IN VIOLATION OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION, AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

{¶20} In his second assignment of error, Hoffman argues that his child endangering conviction and his felony murder conviction are based on insufficient evidence. Specifically, he argues that he did not abuse his son by using a wet tissue to clean out his mouth. We do not agree that Hoffman's two convictions are based on insufficient evidence.

{¶21} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus; *see also State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶22} Initially, we note that Hoffman's assignment of error only challenges one of his child endangering convictions. Hoffman does not challenge the conviction arising from N.H.'s old rib fractures. Instead, he challenges the child endangering conviction that arose from the conduct in which he engaged on the day of N.H.'s death. That child endangering conviction, stemming from a violation of R.C. 2919.22(B)(1), served as the foundation for Hoffman's felony murder conviction.

{¶23} The child endangering statute forbids any person from abusing a child who is under eighteen years of age. R.C. 2919.22(B)(1). "[W]hen a defendant is charged with endangering children under [R.C. 2919.22(B)(1)], the State must prove recklessness as an essential element of the offense." *State v. Jones*, 9th Dist. No. 25986, 2012-Ohio-4256, ¶ 6.

> A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.

R.C. 2901.22(C). "Recklessness, like any other essential element of an offense, may be proved through circumstantial evidence." *Jones* at ¶ 6.

{¶24} Officer Geoffrey Hill testified that he responded to the Hoffman residence to assist the fire department after dispatch informed him that there was an infant who was choking at the residence. Officer Hill spoke with Hoffman outside once the paramedics left with N.H. Officer Hill testified that he asked Hoffman what had happened and Hoffman stated that he had tried to clean his son's mouth with some toilet paper while he was in the process of feeding him. Hoffman told Officer Hill that N.H. swallowed the toilet paper before he could react and he was unable to remove it from his son's mouth.

{¶25} Amy Schaefer, a forensic investigator for the Summit County Medical Examiner's Office, testified that she interviewed Hoffman at the hospital after N.H. had been pronounced dead. Hoffman told Schaefer that N.H. began to drool during his feeding, so he looked for something to wipe N.H.'s mouth. Unable to find a cloth, Hoffman stated, he went to the bathroom, took a few pieces of toilet paper, wetted them, balled them up, and used them to wipe N.H.'s mouth. When he was wiping inside N.H.'s mouth, Hoffman lost hold of the toilet paper and was never able to retrieve it.

{¶26} Other members of the Cuyahoga Falls Police Department interviewed Hoffman at the hospital and later at the police station. Detective Kurt Dirker testified that he interviewed Hoffman at the hospital before Schaefer conducted her interview. Hoffman told Detective Dirker that N.H. had spit up during his feeding, so Hoffman got two to three sheets of wet toilet

paper to wipe N.H.'s mouth. When he wiped N.H.'s mouth with the toilet paper, N.H. "sucked it in" and Hoffman was unable to retrieve it. Three days later, Hoffman spoke with Detective Randy Tlumac at the police station. Hoffman told Detective Tlumac that he used three or four sheets of wet toilet paper to wipe N.H.'s mouth and the toilet paper ended up in N.H.'s mouth as he used it to dab N.H.'s gum line.

{¶27} Dr. Lisa Kohler, the Summit County Chief Medical Examiner, performed N.H.'s autopsy. Dr. Kohler testified that she removed an obstruction from the very back of N.H.'s throat. The obstruction measured approximately two-and-a-quarter inches by one inch by one-half inch. Once the obstruction was removed, Dr. Kohler teased it out and noted that it was consistent with "two thin layers of a facial tissue type product." Dr. Kohler testified that it was impossible for N.H. to have swallowed or sucked in the balled-up tissue that she removed from his throat. She explained that, at around ten weeks of age, infants have a reflex that causes them to push solid materials out of their mouths with their tongues. Therefore, an infant could swallow foreign material only if someone pushed the material past the point of the infant's reflex. Dr. Kohler testified that she ruled N.H.'s death a homicide because there was no way the balled-up tissue she found in his throat got there "without the assistance of another person."

{¶28} Dr. Kohler also noted that N.H. had sustained several other injuries. During her examination of N.H., Dr. Kohler observed both fresh and healing bruises to N.H.'s face in two locations as well as a torn frenulum and bruising to his gums. Dr. Kohler explained that the frenulum is the small piece of tissue in the front of the mouth that connects a person's upper lip to their upper gum. She testified that N.H.'s torn frenulum and bruised gum were due to some blunt force trauma and that, typically, a torn frenulum injury in a baby is one that is caused by the forceful pushing of the baby's lip upward. When she x-rayed N.H. during her examination,

Dr. Kohler also discovered both old and new rib fractures as well as a new fracture to N.H.'s collar bone. Dr. Kohler was able to identify fifteen fractures to N.H.'s ribs that displayed signs of healing and opined that those fractures originally occurred at some point more than a week before N.H.'s death. Dr. Kohler testified that an infant's ribs are very flexible and a great deal of force is required to break them.

{¶29} Dr. Richard Daryl Steiner, the Medical Director of the Care Center at Akron Children's Hospital, testified that he was asked to review N.H.'s case given his experience with child abuse pediatrics. Dr. Steiner opined, based on his review of all of the evidence in the case, that Hoffman's explanation for how the foreign material found in N.H.'s throat came to be there was not plausible. Dr. Steiner elaborated that, given the size of the balled-up tissue Dr. Kohler found, the size of an infant's mouth, and the tongue thrust reflex that a two-month old possesses, "it would not be plausible for that [two-month old] to have gotten that hunk of tissue down into the back of his throat without it having been placed there." Dr. Steiner opined that for the tissue to have gotten into that position, the tissue would have had to have been placed beyond the midline of the tongue.

{¶30} "Circumstantial evidence and direct evidence inherently possess the same probative value * * *." *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. Viewing the evidence here in a light most favorable to the State, we must conclude that the State presented sufficient evidence from which a rational trier of fact could have concluded that Hoffman recklessly abused N.H. on the day of his death. Although Hoffman told the police and the forensic investigator that N.H. somehow accidentally swallowed the balled-up tissue that blocked his airway, there was expert medical testimony that the only way the tissue could have gotten into N.H.'s throat was if someone placed it there. Both Dr. Kohler and Dr. Steiner

testified that an infant of two months has a small anatomy and possesses a reflex which allows the infant to expel any solid foreign material from its mouth. Both doctors opined that the balled-up tissue that ultimately asphyxiated N.H. had been placed far back into his mouth. Moreover, there was testimony that N.H. had sustained other injuries both on the day of his death and prior to that day. The jury could have concluded that the State proved beyond a reasonable doubt that Hoffman placed balled-up tissue into N.H.'s throat and that N.H. was the victim of abuse. Hoffman's argument that his child endangering conviction is based on insufficient evidence lacks merit.

{¶31} Hoffman also argues that his felony murder conviction is based on insufficient evidence. The felony murder statute provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). As previously set forth, Hoffman's child endangering conviction under R.C. 2919.22(B)(1) served as the predicate offense for his felony murder conviction. Hoffman's sole argument is that, because his child endangering conviction is not supported by sufficient evidence, his felony murder conviction also must fail. We have determined, however, that Hoffman's child endangering conviction is not based on insufficient evidence. Therefore, his argument that his felony murder conviction cannot stand lacks merit. Hoffman's second assignment of error is overruled.

### Assignment of Error Number Three

> MR. HOFFMAN'S CONVICTION WAS ENTERED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.

**{¶32}** In his third assignment of error, Hoffman argues that his convictions for child endangering and felony murder are against the manifest weight of the evidence. We disagree.

**{¶33}** In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *Thompkins*, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

**{¶34}** As in his sufficiency assignment of error, Hoffman only challenges the child endangering conviction that served as the predicate offense for his felony murder charge. That child endangering conviction related to the balled-up tissue that ultimately asphyxiated N.H. Hoffman argues that the jury lost its way by not concluding that N.H.'s death was the result of an accident. According to Hoffman, the jury only convicted him of the offense because it heard evidence about N.H.'s prior rib fractures.

**{¶35}** The State produced evidence that Hoffman gave several different versions of the events that occurred at the time of his son's death when pressed about the details. Hoffman told

Officer Hill that he used toilet paper to clean off N.H.'s tongue and, before he could react, N.H. swallowed all of it. Hoffman told Michele Mizda, a clinical social worker who spoke with him at the hospital, that he had used a tissue to wipe N.H.'s chin, a piece of the tissue came off, and the tissue went into N.H.'s mouth as he was crying. Hoffman told Schaefer, the forensic investigator, that he had used several pieces of wetted, balled-up toilet paper to wipe the inside of N.H.'s mouth and lost hold of the paper. Hoffman told Detective Dirker that he had used several pieces of wet toilet paper to wipe spit up from N.H. and that N.H. had "sucked it in." Finally, Hoffman told Detective Tlumac that he used wet toilet paper to clean N.H.'s mouth, but that he only dabbed at N.H.'s gums and the toilet paper never went past N.H.'s gum line. Detective Tlumac testified that, at different points during his interview with Hoffman, Hoffman told him: (1) he did not know if he was wiping N.H. or if N.H. "gulped" the toilet paper, but it ended up in his mouth; (2) when he was dabbing N.H.'s gum line, he did not know if N.H. sucked in the toilet paper or swallowed it, but it ended up in his mouth; and (3) when he was dabbing N.H.'s mouth, N.H. bit or grabbed hold of the toilet paper and tore a chunk of it away.

{¶36} As previously set forth, both Dr. Kohler and Dr. Steiner testified that it would not be possible for a two month old to swallow the type of solid object found in N.H.'s throat. Both doctors testified that a two month old would expel the object due to a tongue thrust reflex unless the object was pushed past the point of the child's reflex. Dr. Steiner went on to explain that even if a child was sticking its tongue out at the point in time that a tissue was placed on top of the tongue, the tissue would not go beyond the midpoint of the tongue (where the thrust reflex ends) when the child retracted its tongue. Dr. Steiner explained that in that scenario the tissue would be scraped off by the child's upper lip and gum due to the small size of the child's mouth.

Only if someone had forced the child's tongue down against its thrust reflex, Dr. Steiner testified, could the tissue have gone beyond the midpoint of the tongue.

{¶37} In response to the testimony of Dr. Kohler and Dr. Steiner, the defense presented the testimony of Dr. Cyril Wecht, an expert in forensic, anatomical, and clinical pathology. Dr. Wecht testified that he believed it was possible for a two month old to swallow a tissue that came into contact with its mouth. According to Dr. Wecht, a baby's desire to swallow an item "might be a matter of palatability" and depend on whether the item "tastes good." Dr. Wecht ultimately concluded that N.H.'s death was accidental, but admitted that it was possible the tissue on which he asphyxiated had been intentionally placed into the back of his throat. The reason that Dr. Wecht thought the death was accidental was that, having reviewed all the evidence, he felt it was much more likely that Hoffman accidentally dropped the wad of tissue into N.H.'s throat. He specified: "I can think of many easier ways to kill a baby and not be discovered than to put a wad of tissue paper in the back of the mouth." Dr. Wecht testified that he had never heard of the term "infant tongue thrust" and did not know what it meant. He agreed, however, that a tissue would have to go past a child's gum line in order for it to be in the child's mouth.

{¶38} Heidi Hoffman, N.H.'s mother, testified that N.H. was a good baby overall, but was fussy and spit up a lot during his feedings. Due to problems with N.H. spitting up and fussing after his bottle, Heidi stated that the pediatrician had suggested holding him upright for an hour after eating. Heidi testified that it was very rare to be able to console N.H. when he became fussy and that it usually took an hour or more of him crying before he would finally exhaust himself and fall asleep. Before N.H.'s death, Heidi stated that she left for work at around 7:00 a.m. and returned at around 5:30 p.m. Meanwhile, Hoffman worked two jobs; one from 12:00 p.m. until 5:00 p.m. and one from 6:00 p.m. until 6:00 a.m. Because Hoffman's day

job was situated in his father's home, he took N.H. with him to work each day, and Heidi took N.H. from him before Hoffman started his night job. Heidi then cared for N.H. in the evenings. Heidi admitted that Hoffman sometimes expressed an interest in arranging child care and told her that "it was stressful" and that "he thought [she] could probably do more to help out."

{¶39} Heidi testified that she never abused N.H. or had any knowledge that he had ever been injured. On the day of N.H.'s death, Heidi testified that she was sleeping when Hoffman came into her bedroom and told her that N.H. was choking on some tissue he had swallowed. Heidi stated that the bathroom in their apartment had big towels, small towels, and wash cloths in it, as well as disposable wipes. Heidi verified that there also was a receiving blanket right on the rocking chair in N.H.'s bedroom and that she had used that very blanket to wipe off her hands when she tried to feel inside N.H.'s mouth for any obstruction.

{¶40} Hoffman informed Mizda, the social worker at the hospital, that he felt like he was doing everything after N.H.'s birth and that "a lot of the responsibility seemed to fall [on] him." Mizda testified that Hoffman seemed upset or angry during that portion of their conversation and, when she asked him how he felt, he replied that he "had gotten more pissed at Heidi than at [N.H.]" about the parenting schedule. Hoffman also spoke about his schedule when Detective Dirker interviewed him at the police station a few days after N.H.'s death. When speaking with Detective Dirker, Hoffman stated that "it pissed him off that he would come home from work at seven in the morning * * * and [Heidi] would * * * bitch about having to take care of the baby."

{¶41} As previously discussed, Dr. Kohler noted several other injuries during her examination of N.H. Specifically, N.H. had two bruises to his face, one of which was old and one of which was fresh, a torn frenulum, bruised gums, a broken collar bone, and rib fractures.

Dr. Kohler testified that bruising injuries in a two month old child are significant because those children are unable to move around on their own so as to accidentally bump into things. She further testified that the specific bruises she observed on N.H.'s face, both of which had been caused by some type of round object, could not have been sustained by medical intervention. As to N.H.'s rib fractures, Dr. Kohler testified that N.H. had fresh fractures, healing fractures without re-injury, and healed fractures that had been re-broken. Dr. Kohler counted a total of fifteen healing fractures, fourteen of which "were recent on healing." She was unable to estimate exactly when the healing fractures had occurred, but stated that it was at least a week before N.H.'s death. Dr. Kohler verified that while it is common not to have any external bruising with such fractures, a great deal of force is required to break a child's flexible ribs. Dr. Kohler could not say whether N.H.'s fresh fractures had been caused by CPR, as she testified that it would depend upon the technique used.

{¶42} Dr. Steiner also testified regarding N.H.'s rib fractures. He testified that the mechanism of injury for such fractures is compression and the forcing of the rib cage backwards. When such a fracture occurs, Dr. Steiner went on, the baby is held by the thorax and the chest is compressed so that the back of the baby's chest wall goes behind its spine. Dr. Steiner testified that he could not definitively say whether N.H.'s new rib fractures were caused by CPR compressions because he did not know how CPR had been performed. Dr. Steiner did say, however, that CPR would not have caused rib fractures if the baby was lying down at the time.

{¶43} Hoffman's own expert also agreed that N.H.'s healing rib fractures were non-accidental. In his expert report, Dr. Wecht wrote that N.H.'s healed rib fractures and collar bone fracture "support a contention of non-accidental, adult inflicted injuries." He further wrote that "[t]here had to be some adult caretaker who could have caused the chest fractures." Dr. Wecht

discounted Hoffman as the possible perpetrator of the injuries in his report due to the fact that he "worked two jobs and likely had little contact with the baby." At trial, however, Dr. Wecht admitted that he was unaware Hoffman was N.H.'s primary caretaker from 7:00 a.m. to 5:00 p.m. Moreover, Heidi Hoffman testified that in the four week period between her return to work from maternity leave and N.H.'s death, she and Hoffman had only asked three different people to watch N.H. on occasions when Hoffman knew he had to make deliveries for his day job. Heidi specified that her aunt watched N.H. once, her cousin watched him twice, and her friend watched him twice. Accordingly, in that four week span of time N.H. was only in the care of someone other than Heidi and Hoffman five times for a limited amount of time.

{¶44} All of the EMS responders who treated N.H. and testified at trial testified that N.H. had blood in his mouth that they had to suction when treating him. N.H. also had a small amount of blood on his face below the nose and on his wrist. Maggie Hobson, one of the EMS responders, testified that N.H. was lying face up on the floor when she arrived on scene. Heidi also testified that N.H. was lying on the floor in front of his crib when she came into his room after Hoffman woke her up. None of the individuals who spoke with Hoffman ever recalled Hoffman saying that he put N.H. back into his crib once he began choking. Hoffman specifically told Detective Tlumac during the interview at the police station that after N.H. swallowed the toilet paper he left N.H. lying on the floor of his bedroom to go wake up Heidi. Even so, Officer James Stanley testified that he observed blood inside of N.H.'s crib when he inspected it on the day of N.H.'s death. N.H.'s bedding then was sent to the Bureau of Criminal Identification and Investigation where testing later confirmed that the blood on the bedding was consistent with N.H.'s DNA profile.

{¶45} Having thoroughly reviewed all of the evidence, we cannot say that the jury lost its way when it convicted Hoffman of child endangering and felony murder. The expert medical testimony here was such that N.H. could not have swallowed the balled-up tissue found in his throat. Given the size of the balled-up tissue as compared to N.H.'s mouth and the fact that two month olds have a tongue thrust reflex, both of the State's experts concluded that the tissue found in N.H.'s throat would have had to have been placed there. Even Hoffman's expert testified that, for N.H. to have swallowed the tissue, his tongue would have had to have been depressed by force at the time. All of the medical testimony was inconsistent with Hoffman's explanation as to what happened. Although Hoffman's detailed explanations widely varied, he never claimed to have been pushing down N.H.'s tongue with the tissue. Instead, he described either that N.H. sucked in the tissue or that he somehow swallowed it when Hoffman was dabbing around his mouth and gums. Thus, the medical testimony did not support Hoffman's version of the events.

{¶46} The actual tissue that the medical examiner extracted from N.H.'s mouth had been balled-up into a wad. N.H. also had a torn frenulum and bruised gums, injuries which Dr. Kohler testified were consistent with blunt force trauma. Additionally, N.H.'s blood was found in his crib despite the fact that Hoffman claimed to have placed him directly on the floor of his room after swallowing the tissue. None of the medical experts who testified were able to definitively say whether some or all of the fresh fractures to N.H.'s ribs were or were not the result CPR. The healing fractures, however, were at least a week old. Both Dr. Kohler and Dr. Steiner testified that they were compression injuries, and Dr. Wecht, the defense expert, agreed that the injuries were non-accidental. Hoffman and his wife were N.H.'s primary caregivers. Heidi specifically testified that there were only a handful of occasions that someone else had watched

N.H.  She also testified that she never harmed N.H.  Although the evidence was circumstantial, the jury could have inferred that Hoffman caused all of N.H.'s rib fractures.  *See Jenks*, 61 Ohio St.3d at paragraph one of the syllabus ("Circumstantial evidence and direct evidence inherently possess the same probative value * * *.").

{¶47} Given all of the evidence before the jury, we cannot say that this is the exceptional case where the jury clearly lost its way by convicting Hoffman.  Hoffman's convictions for child endangering and felony murder are not against the manifest weight of the evidence.  Consequently, his third assignment of error is overruled.

### III

{¶48} Hoffman's assignments of error are overruled.  The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETH WHITMORE
FOR THE COURT

BELFANCE, P. J.
CONCURRING.

{¶49}  I concur in the majority's judgment and most of its analysis.  I write separately to briefly discuss Mr. Hoffman's first assignment of error.  While the majority conducts a detailed and thorough analysis of Mr. Hoffman's argument, I would undertake a more limited review.  There is no dispute that Mr. Hoffman did not preserve his argument for review, thus limiting this Court to determining whether the trial court committed plain error.  To establish plain error,

> "[f]irst, there must be an error, i.e., a deviation from the legal rule.  * * * Second, the error must be plain.  To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings.  * * *  Third, the error must have affected 'substantial rights * * * ' [to the extent that it] * * * affected the outcome of the trial."

*State v. Hardges*, 9th Dist. No. 24175, 2008-Ohio-5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).  "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶50}  Mr. Hoffman makes a very limited argument on appeal.  Essentially, his argument appears to be that he was denied a fair trial because evidence that N.H. suffered prior, older fractures was presented in his murder trial and that the presentation of such evidence in his murder trial denied him a fair trial.  I see no merit to his argument, particularly given our limited review.  There is no question that, during the murder trial, the medical examiner could testify

concerning the infant's condition which included a description of the prior fractures. Thus, the jury would have been able to draw an inference of prior abuse from that testimony alone.

{¶51} In light of the evidence presented supporting the conclusion that Mr. Hoffman was responsible for N.H.'s death and recent injuries, I cannot say the presentation of evidence concerning the older fractures which suggested prior abuse at the hands of an unknown person affected the outcome of the trial with respect to the murder charges. Thus, I agree that Mr. Hoffman's assignment of error is properly overruled.

CARR, J.
CONCURRING IN JUDGMENT ONLY.

{¶52} I concur in judgment only because I disagree with the lead opinion's analysis of Hoffman's first assignment of error. Hoffman forfeited the alleged error by failing to object, limiting this Court's review to plain error under Crim.R. 52(B). I would review Hoffman's assignment of error on the more limited basis required by Crim.R. 52(B) as Judge Belfance has outlined in her concurring opinion. Accordingly, I concur in judgment only.

APPEARANCES:

MELISSA M. PRENDERGAST, Assistant State Public Defender, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.