**[Cite as *State v. Haas*, 2025-Ohio-683.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Toledo　　　　　　　Court of Appeals No.　L-23-1297
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　L-23-1298
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　L-23-1299
　　　　　　　Appellee

　　　　　　　　　　　　　　　　　　　　　　Trial Court No.　CRB-21-09126
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　CRB-23-03520
v.　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　CRB-23-04625

David P. Haas　　　　　　　　　　　　　　**DECISION AND JUDGMENT**

　　　　　　　Appellant　　　　　　　　　　Decided: February 28, 2025

* * * * *

Rebecca Facey, Toledo Prosecuting Attorney, and
Jimmie L. Jones, Assistant Prosecuting Attorney, for appellee.

Samuel E. Gold, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, following a jury trial, defendant-appellant, David Paul Haas, appeals the December 7, 2023 judgments of the Toledo Municipal Court, convicting him of menacing, obstructing official business, and telecommunications harassment and sentencing him to maximum sentences in the work release program. For the following reasons, we affirm.

## I. Background

**{¶ 2}** David Paul Haas was criminally charged in three Toledo Municipal Court cases. In case No. CRB-21-09126, he was charged with telecommunications harassment, a violation of R.C. 2917.21(A)(5), a first-degree misdemeanor. In case No. CRB-23-03520, he was charged with menacing, a violation of R.C. 2903.22(A), a fourth-degree misdemeanor. And in case No. CRB-23-04625, he was charged with criminal trespassing, a violation of R.C. 2911.21, a fourth-degree misdemeanor, and obstructing official business, a violation of R.C. 2921.31, a second-degree misdemeanor.

**{¶ 3}** Haas entered a plea of no contest to the charge of telecommunications harassment. The charges in case Nos. CRB-23-03520 and CRB-23-04625 were consolidated and tried together to a jury.

## A. Toledo Municipal Court Case No. CRB-23-04625

**{¶ 4}** According to the evidence presented at trial, on May 12, 2023, an employee of Huntington Bank called 9-1-1 to report that there was a customer in the Heatherdowns Boulevard branch who was refusing to leave and was recording the employees. Soon after, a Huntington security operations employee called to report that a customer at the Glendale Avenue branch was being irate and refusing to leave.

**{¶ 5}** Officers reported to the Glendale branch. The manager of the branch, N.L., testified that he was at lunch and received a call from one of the bankers advising him that there was an unruly, upset customer at the branch. N.L. returned from lunch early and observed the irate customer pacing in front of his office. A police officer was in

2.

N.L.'s office. N.L. was told that the customer wanted to make a withdrawal, but did not have identification, which was needed to effect the withdrawal.

{¶ 6} The officer in N.L.'s office told him that he knew the customer's name and address—it was David Haas. Haas was yelling at N.L. through the glass wall of the office that he wanted to close his account. N.L. was not aware if anyone from the bank had told Haas to leave, and he never told Haas to leave.

{¶ 7} The customer having been identified by the officer, N.L. accessed the account and learned that there was a "lost-contact" hold on Haas's account, which was triggered when a piece of mail addressed to Haas was returned to the bank. Under that circumstance, to release the hold, the customer was required to come into the bank with identification. Although Haas did not have his identification, N.L. completed a withdrawal slip so that he could give Haas his money and close his account. Haas refused to sign the slip, however, so N.L. was unable to disburse the funds and close the account. Haas's checking account had a balance of less than $10.

{¶ 8} Officer Denise Fisher testified that she received a call of an unwanted individual at the Glendale Huntington branch, and she was the second officer to arrive; Officer Mike Johnson was the first on the scene and was already speaking to the bank manager when Officer Fisher arrived. Officer Fisher recalled that Haas was standing outside the office with his cell phone out, perhaps recording the incident. Haas was upset that the bank employee was pulling up his account information with the officers nearby.

3.

{¶ 9} The bank manager completed a withdrawal slip and went out to the counter to try to get Haas to sign it so that he could close Haas's account. The officers stood behind the manager. Haas spoke aggressively to the bank manager and would not sign the slip. Officer Fisher told Haas he had to leave. Haas disputed that the officer had authority to require him to leave. Eventually, Haas left the building but remained on the premises for 20 to 30 minutes. While they waited for their sergeant to arrive, the officers shielded customers from Haas so that they could enter the bank.

{¶ 10} Sergeant Freels arrived at the scene and confirmed with the officers that Haas had been told to leave the property. Sergeant Freels told Haas not to go anywhere and started walking toward him, but Haas tried to "jog" and "hustle" to his car. Sergeant Freels grabbed Haas's arm and said "no, now it's too late." Officer Fisher helped Sergeant Freels handcuff Haas. Haas did not "outright fight," but he stiffened, resisted putting his arms together, and yelled at the officers. Officer Fisher explained that this hindered the officers in their duties and responsibilities because there was now risk that Haas would get hurt and the officers were unable to respond to other calls for service because the arrest was being prolonged by Haas's failure to cooperate.

{¶ 11} Officer Fisher conceded on cross-examination that she did not try to interview Haas or anyone else at the bank. She also conceded that she never heard Haas say that he wanted to close his account or make a withdrawal. She reiterated that she told Haas to leave the bank and while he left the building, he did not leave the bank property. It was Officer Fisher's position that the bank and the walks surrounding the bank building

4.

were all bank property. Officer Fisher acknowledged that Haas had not been told that he was under arrest when he started to quickly move toward his car, but she contended that he should have known that he was being detained when Sergeant Freels said, "come here, I want to talk to you."

## B. Toledo Municipal Court Case No. CRB-23-03520

{¶ 12} According to the evidence presented at trial, Haas and his wife lived next door to T.M. and J.M., a retired couple in their sixties. T.M. and J.M. have three daughters and three young grandchildren. They have lived in their home for almost 40 years.

{¶ 13} T.M. testified that the Haases began living next door to them approximately seven years earlier. At first they would wave hi and bye to one another, but one day in October of 2021, T.M. woke up and heard swearing. She looked outside and saw Haas swearing at an employee of either Columbia Gas or Toledo Edison. T.M. went to the kitchen to make coffee, and someone began pounding at her door. She answered and was confronted by Haas who asked her "why the eff are you filming me?" T.M. told Haas that she had not been filming him. Haas did not believe T.M., and he called her a bitch.

{¶ 14} After the incident in October, small incidents occurred. The next significant incident happened in April of 2022. Haas and his wife were outside and T.M. and J.M. were in the living room of their home. T.M. and J.M. could hear the Haases complaining about someone calling the police on Haas, and they kept saying T.M.'s name. T.M. heard Haas say "eff [T.M.]" and "[s]he can suck my -- and then the word."

5.

{¶ 15} After these incidents, anytime T.M. went outside and Haas was home, he would say things from inside the house while the windows were open. As she carried groceries in, for instance, Haas said things like "look at that fat fucking bitch. Look at her arms. Look how fat her arms are." It got to the point that T.M. would not go outside unless her husband was home. Haas also taunted T.M.'s daughter when she came over, saying things from his front porch like "you like this, you want some of this, pointing to his crotch."

{¶ 16} T.M. and J.M. had contractors working on their home from March until July and Haas harassed the contractors. One day in particular, he put a ladder in front of his house so that he could see over the contractor's truck. He harassed the workers all that day. That same night, J.M. went out to pick up dinner, and Haas yelled at him and called him names. T.M. opened the door to say something to him and he called her the "c-word." It got to the point that T.M. would only leave her house if there was someone there with her.

{¶ 17} At the recommendation of police officers, T.M. and J.M. got security cameras that they affixed to their house that recorded both audio and video 24 hours a day. J.M. checked the cameras every morning. In October of 2022, Haas could be heard on the cameras, saying "we need to fuck her up." They used T.M.'s name during these conversations. T.M. was petrified because she believed Haas would actually do something to her.

6.

{¶ 18} On April 3, 2023, T.M. and J.M. were babysitting their three-year-old and seven-year-old granddaughters. T.M. and the seven-year-old went to an exercise class then brought home food. T.M. thought the Haases were both gone, but when she got out of the car, Haas was outside and called to his wife (who actually was not even home), "hand me the subpoena for the [M family]. [T.M]'s there. Hey, [T.M.], wait, wait, I've got a subpoena for you." He started walking toward T.M. with something rolled up in his hand. She tried to get her granddaughter into the house as quickly as possible, but the screen door was locked. She led her granddaughter off the side of the porch so they could get to the back door.

{¶ 19} J.M. was in the backyard and heard Haas yelling. J.M. encountered T.M. as she was heading toward the backyard. T.M. described what had happened, and J.M. told her that Haas's wife was not even home. T.M. took the kids inside and vomited in the kitchen sink because the interaction had scared her so much. J.M. went out to confront Haas and T.M. called 9-1-1. The interaction was recorded on the security cameras and played for the jury.

{¶ 20} T.M. explained that Haas's past behavior made her afraid that he would kill her. She described his behavior as unpredictable and she believed he was capable of killing her, especially given that Haas was having a conversation that day with someone who was not there and was walking toward her with an outstretched hand. Although Haas said he was coming over to serve her a subpoena, she did not believe he had a subpoena in his hand, and she was frightened. She said that video footage showed him

7.

pacing the yard back-and-forth waiting for her to get home and talking and swearing about her and her family.

{¶ 21} On cross-examination, T.M. conceded that she had never seen Haas commit a violent act, but she said she had seen him hold his phone just inches from people's faces, recording them. She testified that she had tried to get a civil protection order, but her request was denied. T.M. said that she and her husband had had to call the police on Haas several times in the last year. She acknowledged that when her husband went to confront Haas, he walked toward the property line and called for Haas. She also admitted that on two occasions, her husband called Haas "a little bitch." T.M. clarified that she was not afraid of being served with a subpoena—she was afraid because she did not believe that Haas had a subpoena in his hand. She did not know what it was, but she never believed it was a subpoena.

{¶ 22} Haas's wife, S.H., testified in Haas's defense. She said that she and Haas used to have a good relationship with the M family. She testified that neighbors started calling the police on her husband for petty reasons. She said that she had also called the police on the M family, filled out police reports against them, and tried unsuccessfully to get a civil protection order. S.H. stated that the M's have never been arrested, but her husband had been arrested three times. She maintained that it was stressful living next to them. She described that she and Haas feel like they always have to look over their shoulders, and their children never want to be outside anymore. She also claimed that they are constantly being recorded.

8.

**{¶ 23}** On cross-examination, the city played a recording of a 9-1-1 call made by Haas on April 3, 2023. He said he wanted to file an "informational report." The 9-1-1 operator attempted to get Haas's phone number so she could send a crew out to take a statement within the next few days. Haas refused, told her that there was no need for police to come to the address, called the operator manipulative, and thanked her "for not doing her job." S.H. did not agree that her husband was being difficult during that conversation.

## C. Convictions and Sentencing

**{¶ 24}** At the close of the city's case, the trial court prompted Haas to move for acquittal under Crim.R. 29. The trial court granted this motion as to the trespassing charge, but otherwise denied the motion. The jury found Haas guilty of obstructing official business and menacing. The trial court ordered a PSI and continued the matter for sentencing on case Nos. CRB-21-09126, CRB-23-03520, and CRB-23-04625.

**{¶ 25}** At the sentencing hearing held on December 7, 2023, the trial court imposed a jail term of 180 days on the telecommunications harassment conviction, 30 days on the menacing conviction, and 90 days on the obstructing official business conviction, all of which may be served in work release. The court stayed Haas's sentence pending appeal.

**{¶ 26}** Haas appealed. He assigns the following errors for our review:

1. The trial court erred by denying trial counsel's motion in opposition to consolidation of Appellant's cases into two separate trials.

9.

2. Because these cases were not severed, the jury was unable to hear the evidence free from prejudice, and their verdict was against the manifest weight of the evidence.

3. Appellant's trial counsel was ineffective in their representation.

4. The trial court violated Appellant's Sixth Amendment Rights by not permitting counsel to withdraw.

5. The trial court erred in imposing maximum sentences.

## II. Law and Analysis

{¶ 27} In his assignments of error, Haas challenges the trial court's decision to join Toledo Municipal Court case Nos. CRB-23-03520 and CRB-23-04625 for purposes of trial. He claims that his convictions were against the manifest weight of the evidence. He argues that trial counsel was ineffective and the trial court violated his Sixth Amendment rights by not allowing trial counsel to withdraw before trial. And he claims that the trial court erred in imposing maximum sentences on each count. We consider each of Haas's assignments in turn.

### A. Consolidation

{¶ 28} In his first assignment of error, Haas argues that the trial court erred by consolidating case Nos. CRB-23-03520 and CRB-23-04625 and trying them together. Although he acknowledges that Ohio courts prefer joinder, he claims that the city relied only on principles of judicial economy and "offered nothing substantive" to dispute that Haas would suffer prejudice, arguing only that the evidence in these separate cases was simple, direct, and easily distinguishable for jurors. Haas maintains that the trial together of multiple, unrelated, criminal charges was negatively perceived by the jury. He

10.

emphasizes that the incidents occurred on different dates and involved different parties, different circumstances, and different sets of facts. He also denies that the evidence was simple, direct, and distinguishable because each had several witnesses and numerous videos and photographs[1].

{¶ 29} The city contends that when a defendant makes a pretrial motion for severance, he is required to renew the motion at the close of the prosecution's case or after the conclusion of the evidence, and the failure to do so forfeits all but plain error. Here, the city points out, Haas did not renew his motion. It reiterates that the evidence was simple and direct and was clearly demarcated by a break between the presentation of the two cases. It maintains that the simplicity and directness of the evidence overcomes any claim of prejudice. It emphasizes that Haas has not demonstrated plain error.

{¶ 30} Under Crim.R. 13, "[t]he court may order two or more complaints to be tried together, if the offenses . . . could have been joined in a single complaint." Two or more offenses may be charged in the same complaint if they are of "the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). It is well-settled that joinder is favored and is to be "liberally permitted." *State v. Scott*, 2003-Ohio-2797, ¶ 13 (6th Dist.), quoting *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992). "The law favors joinder for

---

[1] No photographs were included in the record or described in the transcript's table of exhibits.

public policy reasons, such as: to conserve judicial economy and prosecutorial time; to conserve public funds by avoiding duplication inherent in multiple trials; to diminish the inconvenience to public authorities and witnesses; to promptly bring to trial those accused of a crime; and to minimize the possibility of incongruous results that can occur in successive trials before different juries." *Id.*, quoting *State v. Dunkins*, 10 Ohio App.3d 72, (9th Dist.1983), paragraph one of syllabus.

{¶ 31} Although joinder is well-favored by Ohio law, a defendant may move to sever the charges under Crim.R. 14 upon a showing of prejudice. *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). Under Crim.R. 14, "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses . . . in [a] complaint, or by such joinder for trial together of . . . complaints, the court shall order an election or separate trial of counts . . . or provide such other relief as justice requires." "If a motion to sever is made at the outset of a trial, it must be renewed at the close of the state's case or at the conclusion of all of the evidence so that a Crim.R. 14 analysis may be conducted in light of all the evidence presented at trial." *State v. Rojas*, 2013-Ohio-1835, ¶ 34 (6th Dist.), citing *State v. Hoffman*, 2013-Ohio-1021, ¶ 8 (9th Dist.). If a motion to sever is not renewed, then the issue is forfeited for purposes of appeal. *Id.*

{¶ 32} Here, Haas failed to renew his motion to sever after the evidence was presented. Accordingly, he has forfeited this claim and we must review his assignment of error for plain error. Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of

12.

all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.,* citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. "Reversal is warranted only if the outcome of the trial clearly would have been different absent the error." *Id.,* citing *Long* at paragraph two of the syllabus.

{¶ 33} To prevail on a claim on appeal that the trial court erred in denying a motion to sever, the defendant bears the burden of demonstrating that his rights were prejudiced and he must also "affirmatively demonstrate . . . that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial." *Schaim* at 59. In response, the state can use two methods to defeat a defendant's claim of prejudice under Crim.R. 14: the "other acts" test *or* the more lenient "joinder" test. *Lott* at 163.

{¶ 34} Under the other acts test, the state must show that evidence of the other charged offenses would be admissible as "other acts" under Evid.R. 404(B) even if the counts are severed for trial. *State v. Gibson*, 2015-Ohio-1679, ¶ 28 (6th Dist.), citing *State v. Townsend*, 2002-Ohio-2289 (6th Dist.). Under the joinder test, the state can defeat a claim of prejudice by showing that the jury is capable of separating the proof of each crime because the evidence of each crime is simple and direct. *Id.* "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly

13.

fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Lewis*, 2010-Ohio-4202, ¶ 33 (6th Dist.).

{¶ 35} Here, the joinder test is easily satisfied. This was a one-day trial. Evidence was presented in an orderly manner. The city first presented the evidence in support of case No. CRB-23-04625. That evidence was simple and consisted of three witnesses—one of whom merely authenticated the 9-1-1 calls and incident detail reports. The exhibits consisted of recordings of the two 9-1-1 calls, one snippet of a recording from an officer's body-worn camera used for impeachment purposes (not admitted into evidence), and one incident detail report. The evidence was uncomplicated.

{¶ 36} A recess was taken before the evidence in case No. CRB-23-03520 was presented. That evidence consisted of two witnesses (one for the city and one for Haas), three video recordings, one audio recording, and one incident detail report. Again, the evidence was uncomplicated. Moreover, the court's instructions to the jury emphasized that the matters were separate and distinct and the evidence presented in support of one count could not be considered in resolving the other count.

{¶ 37} We find no plain error in the trial court's decision to join the two cases for trial. We find Haas's first assignment of error not well-taken.

14.

## B. Manifest Weight of the Evidence

{¶ 38} In his second assignment of error, Haas argues that his convictions were against the manifest weight of the evidence.[2] Much of his claim focuses on the prejudice that resulted from joinder, which we will not readdress in considering Haas's second assignment of error.

{¶ 39} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 40} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility

---

[2] Haas did not assign error as to the sufficiency of the evidence, probably because, as explained in his third assignment of error, he believes that the issue was waived by trial counsel. His brief often conflates the concepts of sufficiency and weight of the evidence. Where his arguments raise issues of sufficiency, we address those issues.

15.

determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

### 1. Obstructing Official Business

{¶ 41} As to his conviction for obstructing official business, Haas argues that N.L. was at lunch when the incident at the bank arose, therefore, he lacked personal knowledge of Haas's behavior and relied only on what he was told by officers and Huntington employees. He also contends that Officer Fisher never interviewed Haas and did not perform a complete investigation, yet she prejudicially described Haas as behaving aggressively and making the bank manager fearful.

{¶ 42} Under R.C. 2921.31(A), "[n]o person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers

16.

or impedes a public official in the performance of the public official's lawful duties." To prove a violation of R.C. 2921.31(A), the state must prove "(1) an act by the defendant, (2) done with the purpose to prevent, obstruct, or delay a public official, (3) that actually hampers or impedes a public official, (4) while the official is acting in the performance of a lawful duty, and (5) the defendant so acts without privilege." (Internal quotations omitted.) *State v. Lanier*, 2022-Ohio-1975, ¶ 11 (6th Dist.), quoting *Brooklyn v. Kaczor*, 2013-Ohio-2901, ¶ 7 (8th Dist.), quoting *State v. Kates*, 2006-Ohio-6779, ¶ 21 (10th Dist.).

"The proper focus in a prosecution for obstructing official business is on the defendant's conduct, verbal or physical, and its effect on the public official's ability to perform his lawful duties." *State v. Standifer*, 2012-Ohio-3132, ¶ 28 (12th Dist.), citing *State v. Bailey,* 2008-Ohio-3075, ¶ 28 (12th Dist.), citing *State v. Neptune,* 2000 WL 502830 (4th Dist. Apr. 21, 2000). A conviction for obstructing official business requires evidence that the defendant "actually interfered with the performance of an official duty and made it more difficult." *Id.,* citing *State v. Whitt,* 1990 WL 82592, *2 (12th Dist. June 18, 1990). However, the state need not prove that the defendant successfully prevented the officer from performing his or her official duties. *Id.* Courts have found that the act of fleeing from officers during performance of their official duties is a purposeful act to hinder or delay. *State v. Lanier*, 2022-Ohio-1975, ¶ 13 (6th Dist.).

{¶ 43} Here, Haas's challenge to the weight of the evidence entirely omits any acknowledgment of the facts supporting his conviction. Officer Fisher testified that

17.

Sergeant Freels told Haas not to go anywhere and started walking toward him, but Haas tried to "jog" and "hustle" to his car. Once Sergeant Freels grabbed Haas's arm, he told Haas that it was too late for him to just leave the scene, and attempted to handcuff him. Haas stiffened, resisted putting his arms together, and yelled at the officers. In *Sandifer*, the court found that the evidence was sufficient to convict the defendant of obstructing official business where the defendant screamed, jerked, pulled away, and "stutter stepp[ed]" while being taken into custody. And here, Officer Fisher explained that Haas's conduct hindered the officers in their duties and responsibilities because there was now risk that Haas would get hurt and the officers were unable to respond to other calls for service because the arrest was being prolonged by Haas's failure to cooperate.[3] The jurors were free to find Officer Fisher credible and to believe her testimony.

{¶ 44} Under the facts of this case, we cannot say that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. This is not the exceptional case in which the evidence weighs heavily against the conviction.

### 2. Menacing

{¶ 45} As to his menacing conviction, Haas argues that T.M. testified that she never saw him commit a violent act, her request for a CPO was denied despite the

---

[3] We acknowledge that the trial court dismissed the underlying trespassing charge, but we also note that officers were dispatched to the bank based on a report from Huntington that employees had asked Haas several times to leave and he refused.

magistrate being aware of the incidents she described at trial, T.M. saw nothing in Haas's hand that could cause her harm, and he made no threats and did not yell.

{¶ 46} Under R.C. 2903.22(A)(1), "[n]o person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person . . . or a member of the other person's immediate family." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). Absent a defendant's admission regarding his knowledge, whether a person acts knowingly can only be determined from all the surrounding facts and circumstances, including the doing of the act itself. *State v. Kaufhold*, 2020-Ohio-3835, ¶ 14 (12th Dist.).

{¶ 47} "Menacing can be implied by the offender's actions without a verbal threat, and under ordinary circumstances, [t]he key is whether the victim genuinely believes that he or she is facing physical harm to person or property." (Brackets sic and internal quotations omitted.) *State v. Whitehead*, 2019-Ohio-5141, ¶ 24 (2d Dist.); *State v. Myers*, 2008-Ohio-1913, ¶ 14 (9th Dist.). The prosecution must show that the victim subjectively believed that there was a possibility of physical harm. *State v. McConnaughey*, 2021-Ohio-3320, ¶ 41 (1st Dist.), citing *State v. Lampela*, 2016-Ohio-8007, ¶ 19 (6th Dist.); and *State v. Cox*, 2016-Ohio-3250, ¶ 22 (5th Dist.).

19.

**{¶ 48}** In *Fairview Park v. Werling*, 2024-Ohio-5323 (8th Dist.), the court found that the defendant's conviction for menacing was not against the weight or sufficiency of the evidence where the defendant—who had previously been banned from a Famous Footwear store—screamed at the store's clerk, repeatedly called the clerk the "n" word, accused the clerk of threatening her, yelled to a male acquaintance to call the police, and slammed the door. The court reached this conclusion despite the fact that the defendant never explicitly threatened the clerk.

**{¶ 49}** Similarly, in *State v. Pierce,* 2024-Ohio-5357, ¶ 13 (12th Dist.), the court upheld the defendant's conviction of menacing a library manager even though the defendant never explicitly threatened her with physical harm. The court found that the defendant's behavior during numerous phone calls, voicemails, and visits to the library was at all times agitated and hostile, and the defendant had repeatedly threatened the manager with lawsuits and loss of her job, told her she did not know how to run the library, name-called and berated her, and displayed a contentious and condescending demeanor, one time even cornering her behind a reference desk.

**{¶ 50}** Here, T.M. testified that Haas had been calling her names for months and taunting her on the security cameras that the M family installed at the suggestion of Toledo police. She heard him make physical threats in the past, including in October of 2022, when Haas talked about her on the security cameras, saying "we need to fuck her up." T.M. feared Haas to the point that her husband told him not to talk to her, and she tried not to go outside if Haas was home. Despite being told not to speak to T.M., T.M.

20.

testified that on the date of the offense, Haas walked toward her with his hand outstretched, and although she heard him screaming about a subpoena, she did not believe that there was a subpoena in his hand. She testified that he was behaving strangely that day, conversing with a person who was not there. She feared and believed that Haas would harm her physically, so much so that she vomited in the kitchen sink before calling police to her home. We find that these past experiences, combined with Haas's conduct on the day of the offense, was sufficient to support Haas's conviction, and we find that the jury did not lose its way when it chose to believe T.M.'s testimony.

{¶ 51} We find Haas's second assignment of error not well-taken.

### C. Ineffective Assistance of Trial

{¶ 52} In his third assignment of error, Haas argues that trial counsel was ineffective. Specifically, he contends that trial counsel demonstrated unfamiliarity with the rules of evidence because he did not know how to respond to an objection made by the city in opening statements and was unable to lay a sufficient foundation to introduce video evidence. He also claims that trial counsel did not know that he should make a Crim.R. 29 motion at the close of the city's case and failed to preserve error by neglecting to renew the motion at the conclusion of his own case. And he insists that in a motion to withdraw, counsel admitted that he was unable to provide an adequate defense. Haas maintains that cumulatively, these errors show a lack of understanding of basic trial procedure that overcomes the presumption of competence.

21.

{¶ 53} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287 (7th Dist. 1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002).

{¶ 54} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 2002-Ohio-4858, ¶ 16 (9th Dist.). To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692. As recognized in *Strickland,* there are "countless ways to provide effective assistance in any given case." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 689.

{¶ 55} As to Haas's claim that trial counsel's failure to renew his Crim.R. 29 motion at the close of evidence waived Haas's challenge to the sufficiency of the

22.

evidence, Haas is simply wrong. As we held in *State v. Messer*, 2017-Ohio-1223, ¶ 18 (6th Dist.), "a criminal defendant does not waive the right to challenge the sufficiency of the evidence or the denial of a Crim.R. 29(A) motion despite failing to renew the motion following the close of all evidence." *See also State v. Anderson,* 2024-Ohio-5515, ¶ 30 (7th Dist.) ("[T]he failure to move for acquittal pursuant to Crim.R. 29 at trial does not result in the waiver of a challenge to the sufficiency of the evidence underlying a conviction on appeal."). Thus, trial counsel's failure to renew his Crim.R. 29 motion at the close of evidence did not waive Haas's challenge to the sufficiency of the evidence and did not affect the outcome of the case.

{¶ 56} As to counsel's initial failure to make a Crim.R. 29 motion at the close of the city's case, it appears that defense counsel may have forgotten—or perhaps never knew—that he should make a Crim.R. 29 motion. Nevertheless, the trial court reminded him and actually granted the motion with respect to the trespassing charge. As such, trial counsel's initial failure to make the motion did not affect the outcome of the case.

{¶ 57} As to Haas's criticism that trial counsel exhibited unfamiliarity with the rules of evidence, this criticism stems from two events. The first occurred during opening statements when the city registered an objection to defense counsel telling the jury to put themselves in Haas's shoes. The city said this was not permissible. Defense counsel responded "[i]s that true?" The court overruled the objection. We find that even if defense counsel did not know whether the city's objection was well-founded or not, his response to the objection had no effect on the outcome of the trial.

23.

{¶ 58} The second event concerns defense counsel's inability to establish a foundation for the admission of video evidence. He sought to admit body camera footage without having a witness present who could lay a foundation for its admission. The trial court did not allow him to admit the recording, but it did allow counsel to use a snippet from the recording for the purpose of impeaching the bank manager. Specifically, the bank manager testified that Haas wanted to close his account. Haas sought to impeach the bank manager with the body cam recording showing that he did not ask to close the account. This example does not constitute ineffective assistance of counsel for several reasons.

{¶ 59} First, Haas was permitted to impeach the witness with the footage. Second, the trespassing charge was dismissed, so the bank manager's recollection of the reason for Haas being at the bank ultimately was not relevant and had no impact on the outcome of the trial. Third, the bank manager testified that Haas was outside the glass asking for his account to be closed, so the fact that the body camera did not pick this up is not dispositive of whether or not Haas said he wanted to close the account. Fourth, the body camera footage also included numerous statements by the officers indicating that Haas was a habitual harasser who was well known to the police, so admission of that exhibit would arguably have been damaging to Haas's defense. Finally, Haas wholly fails to explain how the outcome of the trial would have been different had trial counsel successfully admitted the exhibit.

24.

**{¶ 60}** Haas argues that trial counsel admitted in his motion to withdraw that he was unable to provide an adequate defense. In fact, counsel explained that Haas's lack of cooperation had posed a hindrance to counsel's ability to adequately defend him. This suggests that Haas invited error here. It has been recognized that "if a defendant contributes to his attorney's ineffective assistance by failing to cooperate with counsel, a court will not find error . . . ." *See State v. Scott*, 1998 WL 100411 (4th Dist. Mar. 2, 1998). The record demonstrates that Haas invited error here.

**{¶ 61}** We find Haas's third assignment of error not well-taken.

### D. Counsel's Motion to Withdraw

**{¶ 62}** In his fourth assignment of error, Haas argues that the trial court violated his Sixth Amendment right to counsel by denying his attorney's motion to withdraw as counsel. This court has recognized that "although a criminal defendant must be given a reasonable initial opportunity to retain the counsel of his choice, a court may decline a continuance for the purpose of retaining new counsel, if in balancing that right against the public's interest in the orderly, prompt, and efficient administration of justice, 'the totality of the circumstances indicates that the delay would be unreasonable.'" *State v. Hart,* 2004-Ohio-5511, ¶ 16 (6th Dist.), quoting *State v. Miller,* 2001-Ohio-2635 (4th Dist.). We review the denial of a motion to allow an attorney to withdraw from a case under an abuse-of-discretion standard. *Id.* at ¶ 14, citing *State v. Cowans*, 87 Ohio St.3d 68, 73 (1999).

25.

**{¶ 63}** Here, the docket reflects that while the trial court denied the motion to withdraw as counsel, it added the caveat that "if Defendant hires new counsel and that counsel is available to proceed to trial on 09/13/2023, court will entertain motion to withdraw." Given that Haas did not identify another attorney who could proceed to trial on the scheduled date, he apparently did not find one. We find no abuse of discretion in the trial court's decision.

**{¶ 64}** We find Haas's fourth assignment of error not well-taken.

### E. Haas's Sentence

**{¶ 65}** In his fifth assignment of error, Haas argues that the trial court erred by imposing maximum sentences on each count. He claims that under R.C. 2929.22, a court may impose the longest jail term authorized only upon offenders who commit the worst forms of the offense or upon offenders whose conduct and response to prior sanctions for prior offenses demonstrate that the imposition of the longest jail term is necessary. He maintains that he has no mental health, alcohol, or substance abuse diagnoses, no history of violent convictions, and no felony record. And while he acknowledges that he "has had contacts with the Toledo Municipal Court," he emphasizes that none of these offenses indicate that he would be unable to abide by community control. Haas insists that his conduct was not so egregious as to leave the court with no option but to incarcerate him.

26.

{¶ 66} Under R.C. 2929.22(B)(1), in addition to any other factors that are relevant to achieving the purposes and principles of sentencing, the court must consider the following factors in determining the appropriate sentence for a misdemeanor:

    (a) The nature and circumstances of the offense or offenses;

    (b) Whether the circumstances regarding the offender and the offense or offenses indicate that the offender has a history of persistent criminal activity and that the offender's character and condition reveal a substantial risk that the offender will commit another offense;

    (c) Whether the circumstances regarding the offender and the offense or offenses indicate that the offender's history, character, and condition reveal a substantial risk that the offender will be a danger to others and that the offender's conduct has been characterized by a pattern of repetitive, compulsive, or aggressive behavior with heedless indifference to the consequences;

    (d) Whether the victim's youth, age, disability, or other factor made the victim particularly vulnerable to the offense or made the impact of the offense more serious;

    (e) Whether the offender is likely to commit future crimes in general . . .;

    (f) Whether the offender has an emotional, mental, or physical condition that is traceable to the offender's service in the armed forces of the United States and that was a contributing factor in the offender's commission of the offense or offenses;

    (g) The offender's military service record.

{¶ 67} R.C. 2929.22(C) states that before imposing a jail term, the court must consider the appropriateness of imposing a community control sanction. It also specifies that "[a] court may impose the longest jail term authorized under section 2929.24 of the Revised Code only upon offenders who commit the worst forms of the offense or upon offenders whose conduct and response to prior sanctions for prior offenses demonstrate

27.

that the imposition of the longest jail term is necessary to deter the offender from committing a future criminal offense." *Id.* We review misdemeanor sentences for an abuse of discretion. *State v. Johnson*, 2019-Ohio-4613, ¶ 31 (6th Dist.), citing *State v. Ostrander*, 2011-Ohio-3495, ¶ 28 (6th Dist.).

{¶ 68} A trial court is not required to make findings on the record to support the imposition of a maximum sentence. *State v. Yeban*, 2024-Ohio-2545, ¶ 69 (1st Dist.), citing *State v. Adkins*, 2020-Ohio-3296, ¶ 13 (2d Dist.). "On a silent record, reviewing courts often presume that trial courts considered the proper statutory criteria for a misdemeanor sentence." *Id.* at ¶ 70, citing *State v. Brooks*, 2006-Ohio-4610, ¶ 23 (7th Dist.). That presumption will be destroyed if, for instance, the trial court introduces an improper factor into the maximum sentencing determination. *Id.,* citing *Brooks* at ¶ 26. This happened in both *Yeban* and *Brooks*. In those cases, the courts both stated that they were imposing maximum sentences because they believed the defendants were lying. The appellate courts found abuses of discretion under those circumstances because it was clear that maximum sentences were imposed for reasons outside the appropriate statutory considerations.

{¶ 69} Here, the trial court explained its rationale for why a community control sanction was not feasible:

> . . . I like to, kind of, help the person that finds himself embroiled in the criminal justice system. You know, if there is a drug or alcohol or mental health component that needs to be addressed, I think I can better serve the community by addressing those kind of underlying issues that a defendant may have. Ultimately, you know, so I think I have an obligation to try and help anyone who is here before me on a criminal charge. But I

28.

have to weigh that against protecting the community. And I had one in here this morning. I think the person it was his third lifetime OVI or third within ten. And it was clear that he had some underlying mental health, depression issues, and I structured a sentence that would hopefully attempt to address that.

Here I'm really at a bit of a loss. As far as I know, Mr. Haas has no drug or alcohol problems, and I am unaware of any mental health problems that he has. So I've got -- I don't know -- there's nothing I can do on probation to try to address. I mean, for whatever reason, you know, Mr. Haas chooses to conduct himself in the way that he does, has on multiple occasions that have lead [sic] to these several convictions now. So given that there is not anything I can do on probation to correct behavior, then I'm kind of left with, you know, I think that I need to mete out a punishment hopefully so that the cost of acting in a way that he has on these three separate occasions will hopefully persuade him not to act similarly into the future.

{¶ 70} The court was silent as to its reason for imposing the maximum sentence. The presentence investigation disclosed few prior convictions, but it did demonstrate a pattern of harassing behavior that seemed to intensify despite the imposition of community control sanctions for previous incidents. In the absence of evidence that the trial court considered improper factors, we will presume that the trial court considered only the proper statutory criteria when it imposed the maximum sentences here.

{¶ 71} We find Haas's fifth assignment of error not well-taken.

### III. Conclusion

{¶ 72} The trial court did not err in joining two of Haas's cases for trial. The evidence in each case was simple and direct. We find Haas's first assignment of error not well-taken. Haas's convictions were not against the manifest weight of the evidence. We find his second assignment of error not well-taken. Trial counsel was not ineffective

29.

because any alleged errors did not affect the outcome of the trial. We find Haas's third assignment of error not well-taken. Haas's Sixth Amendment right to counsel was not violated by the trial court's denial of counsel's motion to withdraw. The court indicated that it would reconsider if new counsel was prepared to go to trial on the scheduled trial date. We find his fourth assignment of error not well-taken. And the trial court did not abuse its discretion in imposing maximum sentences. There was no evidence that the trial court considered information outside the statutory criteria. We find Haas's fifth assignment of error not well-taken.

{¶ 73} We affirm the December 7, 2023 judgments of the Toledo Municipal Court. Haas is ordered to pay the costs of this appeal under App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J. _____

_____
JUDGE

Myron C. Duhart, J. _____

_____

Charles E. Sulek, P.J. _____   JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.